FILED
IN CLERKS OFFICE

2020 JUL 23 PM 1: 43

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ROBERT BELCHER and<br>ZARINA BELCHER,<br><br>        Plaintiffs,<br>v.<br><br>BANK OF NEW YORK, MELLON,<br>SELECT PORTFOLIO SERVICING, INC.,<br>AND JOHN DOES 1-10,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:20-cv-10511-IT<br>)<br>)<br>)<br>) |

---

## AFFIDAVIT AND TESTIMONY OF MARIE MCDONNELL, CFE, MAFF
## IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND THE COMPLAINT UNDER
## Fed. R. Civ. P. Rule 15(a)(2)

---

COMMONWEALTH OF MASSACHUSETTS)
COUNTY OF BARNSTABLE                ) ss.

Being duly sworn, Marie McDonnell hereby deposes and says on oath as follows:

1.      I am a natural born citizen of the United States of America and a resident of the Commonwealth of Massachusetts. I am over the age of majority (18 years) and believe in the obligations of an oath.

2.      I am a *Mortgage Fraud and Forensic Analyst*™, a *Certified Fraud Examiner* (CFE), and a *Master Analyst In Financial Forensics* (MAFF) with over thirty-three (33) years' experience in transactional analysis, mortgage auditing, and mortgage fraud investigation.

3.  I am the President and Chief Executive Officer of McDonnell Analytics, Inc. also d/b/a McDonnell Property Analytics (the "Firm"), a litigation support and research firm having a principal place of business at 15 Cape Lane, Brewster, Massachusetts 02631. The Firm, among other services, provides mortgage-backed securities research and foreclosure forensics to attorneys nationwide. McDonnell Property Analytics also advises and performs services for county registers of deeds, attorneys general, courts and other governmental agencies.

4.  I have personal knowledge of the facts contained herein and, if called upon, could and would competently testify thereto. My credentials are set forth in a curriculum vitae attached hereto as Exhibit "A". (*See* Exhibit A. – Curriculum Vitae of Marie McDonnell).

## I. EXPERT ENGAGEMENT

5.  On July 20, 2020, Robert Belcher and his wife Zarina Belcher ("the Belchers") engaged me to review a certain consumer mortgage transaction that took place on December 22, 2005, that encumbers the title to their principal residence located at 590 Truman Highway, Hyde Park, Suffolk County, Massachusetts 02136 (the "Property") which is subject to imminent foreclosure.

6.  To enforce their rights pursuant to Paragraph 22 of the underlying Mortgage, the Belchers ("Plaintiffs") filed a Complaint against the alleged Mortgagee and its agents ("Defendants") in the Superior Court Department of the Massachusetts Trial Court, Suffolk County, Boston, Massachusetts on or about February 27, 2020. Defendants removed the case to the United States District Court for the District of Massachusetts on March 12, 2020, and then filed a Motion to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, based upon a failure to state a short, plain statement of their claim and a failure to set forth a viable claim for which relief may be granted.

7. On July 2, 2020, the Court granted Defendants' Motion to Dismiss, but allowed Plaintiffs to file a motion for leave to file an amended complaint provided Plaintiffs attach the proposed amended complaint thereto and submit both by July 23, 2020.

8. Although I have had only three (3) days to review the subject transaction, the facts and evidence I have uncovered to date demonstrate that Plaintiffs have significant contractual, statutory, and regulatory grounds to assert their defenses against Defendants' wrongful foreclosure action. Ideally, I would be given 60 days to send Defendant Select Portfolio Servicing, Inc. (the "Servicer") a Request for Information to obtain copies of the underlying mortgage loan documents, a life of loan transaction history, the contractually mandated pre-acceleration notice of default and right to cure letter, the collection call log, the correspondence call log, and other documents contained within the servicing file to which I am entitled pursuant to the Real Estate Settlement Procedures Act.

9. This would allow me time to work up a thorough analysis and confer with a Massachusetts licensed attorney to develop an amended complaint that provides the legal basis for Plaintiffs' claims and defenses. To comply with the Court's Order of July 2, 2020, I submit the following facts and evidence based upon my review of all available documentation in light of my specialized knowledge, skills, education, experience and training over thirty-three (33) years of practice.

## II. SUMMARY OF FINDINGS

10. After undertaking an intensive examination of the subject transaction and the documentary evidence available to me for review, I find as follows:

 A. **STANDING**: There are material skips and gaps in the chain of ownership and physical possession of the subject Adjustable Rate Note ("Note") that indicate the

Note and Mortgage are held by separate entities. (*See Eaton v. Fed. Nat'l Mortg. Ass'n*, 462 Mass. 569, 969 N.E.2d 1118 (Mass., 2012)).

B. **CHAIN OF TITLE**: The Adjustable Rate Note and Mortgage ("Mortgage Loan") at issue were granted in favor of the Lender, Union Federal Bank of Indianapolis, on December 22, 2005. Amongst the closing documents was a Notice of Assignment, Sale, or Transfer of Servicing Rights to EMC Mortgage Corporation ("EMC") effective February 1, 2006. (*See* Exhibit B. – Notice of Assignment, Sale, or Transfer of Servicing Rights)

It appears that EMC purchased the Mortgage Loan at this point and sold it to Washington Mutual Bank, FA ("WAMU"). The evidence to support this theory is fourfold:

#1) the Belchers have a copy of the Original Adjustable Rate Note that contains a signature "swirl" used by WAMU to indicate that it owns and is in physical possession of the original Note; (*See* Exhibit C. – Adjustable Rate Note, 12/22/2005)

#2 there is a handwritten 8-digit Loan I.D. number underneath the MERS MIN# that indicates it may have been previously securitized;

#3) the MERS® System indicates that Chase Bank, N.A. fka WAMU, Monroe, LA[1] was servicing the Belchers' Mortgage Loan when it was deactivated in the MERS® System; (*See* Exhibit D. – MERS Research Results, Servicer I.D.)

#4) Washington Mutual Bank, FA heavily promoted the origination and securitization of negative amortization, pay-option Adjustable Rate Mortgage loans of this kind.

Curiously, there is a 6-month gap between the origination of the Belchers' Mortgage Loan on December 22, 2005 and the Closing Date for the Structured Asset Mortgage Investments II Trust 2006-AR4 (the "Bear Stearns Trust")[2] which occurred on June 30, 2006. In my experience, mortgage loans that were originated to feed Bear Stearns' securitization pipeline were pre-pledged and securitized within 30 to 45 days of origination. (*See* Exhibit E. – Prospectus Supplement Excerpt)

---

[1] This reference to "JPMorgan Chase Bank, N.A. fka WAMU, Monroe, LA" indicates that Washington Mutual Bank, FA previously serviced the Belchers' Mortgage Loan Account at its operations center in Monroe, Louisiana. JPMorgan Chase Bank, N.A. acquired Washington Mutual Bank's servicing portfolio from the Federal Deposit Insurance Corporation on September 25, 2008 when the Failed Bank was closed by the Office of Thrift Supervision and taken into receivership by the FDIC.

[2] The Structured Asset Mortgage Investments II Trust 2006-AR4 was underwritten by Bear, Stearns & Co. Inc. EMC Mortgage, a wholly owned subsidiary corporation of The Bear Stearns Companies Inc., was the Seller/Sponsor of this securitization as well as one of the servicers.

The appearance of WAMU in the chain of title, and the 6-month gap noted above raise material questions with respect to whether the Belchers' Mortgage Loan was double-pledged, or whether the Bear Stearns Trust acquired *securities* from WAMU versus the *whole loan*.

In addition, because the Adjustable Rate Note at issue contains a negative amortization feature, it is non-negotiable and proof of ownership must follow the dictates of Article 9 of the Uniform Commercial Code, i.e., The Bank of New York Mellon as Successor Trustee must document the complete chain of title and offer evidence to prove that valuable consideration was paid to the previous owner.

The Assignment of Mortgage dated April 26, 2010 filed for record in the Suffolk County Land Court Registry on May 6, 2010 is a litigation device that was fabricated to give the appearance in the chain of title that the Bank of New York Mellon formerly known as The Bank of New York as successor Trustee to JPMorgan Chase Bank, N.A., as Trustee for the Certificateholders of Structured Asset Mortgage Investments II Trust 2006-AR4 Mortgage Pass-Through Certificates, Series 2006-AR4 has the requisite authority to foreclose. (*See* Exhibit F. – Assignment of Mortgage, 04/26/2010)

If the Court accepts the above referenced Assignment as valid, then The Bank of New York Mellon as Successor Trustee is nothing more than a debt buyer as it acquired the Mortgage Loan Account one year after the Belchers allegedly defaulted.

C. **CONDITIONS PRECEDENT**: After reviewing a 424-page response to Robert Belcher's Qualified Written Request provided to him on June 8, 2020 by Parker Ibrahim & Berg LLP on behalf of Defendant Select Portfolio Servicing, Inc., it appears that Plaintiffs never received the pre-acceleration notice of default and right to cure letter mandated by Paragraph 22 of the Mortgage which is a condition precedent to the institution of a foreclosure action.

D. **STATUTORY VIOLATIONS**: According to Defendant Select Portfolio Servicing, Inc.'s Payoff Statement dated April 22, 2020, the subject Mortgage Loan Account fell into default on April 1, 2009, and the default was never cured. (*See* Exhibit G. – SPS Payoff Statement, 04/22/2020)

The MERS® System indicates that JPMorgan Chase Bank, N.A. fka WAMU, Monroe, LA was servicing the Belchers' Mortgage Loan when it was deactivated in the MERS® System. Accordingly, JPMorgan Chase Bank, N.A. fka WAMU would have issued the pre-acceleration notice of default and right to cure letter mandated by Paragraph 22 of the Mortgage ("Paragraph 22 Notice") in or about June or July of 2009.

Defendant Select Portfolio Servicing, Inc. ("SPS") began servicing Plaintiff's Mortgage Loan Account on or about November 1, 2014 —more than 5 ½ years *after* the alleged default. Based upon SPS's response to Mr. Belcher's Qualified Written Request of June 8, 2020, it appears that SPS's servicing records do not contain the previous servicers' business records.

Without having proof that JPMorgan Chase Bank, N.A. fka WAMU sent the Belchers the contractually mandated Paragraph 22 Notices, SPS was prohibited from invoking the rights and privileges afforded pursuant to M.G.L. c. 183 § 21 and M.G.L. c. 244 § 14 to foreclose the subject Mortgage.

E. **REGULATORY VIOLATIONS**: 209 Mass. Code Regs. 18.21A Mortgage Loan Servicing Practices requires at (2)(c) that "A third party loan servicer shall certify in writing the basis for asserting that the foreclosing party has the right to foreclose, including but not limited to, certification of the chain of title and ownership of the note and mortgage from the date of the recording of the mortgage being foreclosed upon. The third party loan servicer shall provide such certification to the borrower with the notice of foreclosure, provided pursuant to M.G.L. c. 244, § 14 and shall also include a copy of the note with all required endorsements."

On January 24, 2020, Defendant Orlans PC sent Zarina Belcher a 2-page Notice of Intention to Foreclose by Certified Mail/Return Receipt Requested. I asked Mrs. Belcher to comb her files to make sure that she had sent me all attachments to the Notice which should have included: a) a Certification Pursuant to Massachusetts 209 C.M.R. 18.21A(2)(c); and b) a copy of the original Adjustable Rate Note with all required endorsements. (*See* Exhibit H. – Notice of Intention to Foreclose, 01/24/2020)

I am told, and Plaintiffs allege, that neither of them received the certification of the chain of title and ownership of the note and mortgage as required by 209 C.M.R. 18.21A(2)(c). If proven at trial, then Defendants will have violated this important consumer protection regulation.

F. **PREDATORY LENDING**: I analyzed the mechanics of the Adjustable Rate Note at issue and found that the underwriting, structure, pricing and risk layers integrated into the Note render it "presumptively unfair," unconscionable, and predatory in the extreme. This loan was made without regard to the borrower's ability to repay and this Court should declare that it violated the Massachusetts Predatory Home Loan Practices Act codified at M.G.L. c. 183C et seq.

Because the foreclosure action arises out of the consumer mortgage transaction at issue, the Belchers may raise their rights under the Truth In Lending Act, the Massachusetts Consumer Credit Disclosure Act, the Massachusetts Predatory Home Loan Practices Act and the Massachusetts Supreme Judicial Court's rulings in *Com. v. Fremont Investment & Loan*, 897 N.E.2d 548, 452 Mass. 733 (Mass., 2008) and its progeny.

To assist the Court, I develop my analysis more particularly below.

### *Predatory Home Loan Practices Act*

11. In an attempt to confront the growing problem of predatory lending, the Massachusetts legislature enacted the Predatory Home Loan Practices Act ("PHLPA" or the

"Act") on August 9, 2004, which became effective on November 7, 2004. The Act is codified at M.G.L. c. 183C *et seq*. The purpose of the Act was to restrain mortgage lenders from making "high cost home mortgage loans" and imposing points, fees, and prepayment penalties that were deemed to be excessive. Section 2 defines a "high cost home mortgage loan" as follows:

> "High cost home mortgage loan", a consumer credit transaction that is secured by the borrower's principal dwelling, other than a reverse mortgage transaction, a home mortgage loan that meets 1 of the following conditions: —
>
> (i) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired.
>
> (ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400; the $400 figure shall be adjusted annually by the commissioner of banks on January 1 by the annual percentage change in the Consumer Price Index that was reported on the preceding June 1.

12. Immediately after the General Assembly enacted this consumer protection legislation, the mortgage banking industry adopted policies, procedures, and technologies to conform their pricing models to the tolerances established by the Act. To counter this incursion on their profits, mortgage lenders developed innovative products and pricing structures that were just as lucrative, but which skated around the definitions contained in M.G.L. c. 183C(2).[3] The subject transaction provides a classic and compelling example of how this was accomplished.

---

[3] This explains why the Massachusetts Attorney General, Martha Coakley, filed consumer protection lawsuits against Fremont Investment & Loan, Option One Mortgage Corporation, New Century Mortgage Corporation and other subprime lenders.

## The Fremont Test

13.  On October 4, 2007, the Commonwealth of Massachusetts, acting through the Attorney General, commenced a consumer protection enforcement action in the Superior Court of Suffolk County against Fremont Investment & Loan and its parent company, Fremont General Corporation (collectively, Fremont), claiming that Fremont, in originating and servicing certain "subprime" mortgage loans between 2004 and 2007 in Massachusetts, acted unfairly and deceptively in violation of M.G.L. c. 93A, § 2.

14.  The Honorable Ralph D. Gants heard the case and issued a preliminary injunction in favor of the Commonwealth enjoining Fremont from foreclosing on any of its roughly 3,000 remaining active mortgages in Massachusetts without the Attorney General's express written approval. Fremont appealed Judge Gants' Order, but on December 9, 2008, the Massachusetts Supreme Judicial Court upheld the preliminary injunction against Fremont.[4]

15.  Judge Gants found that a loan possessing the four characteristics described below is by definition "presumptively unfair" for purposes of considering whether it may have violated the Massachusetts Consumer Protection Statute Chapter 93A:

1. the loan is an adjustable rate mortgage ("ARM") with an introductory period of three years or less;
2. the loan has an introductory or "teaser" rate for the initial period that is at least 3% lower than the fully indexed rate;
3. the borrower has a debt-to-income ratio that would exceed fifty percent if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and

---

[4] *Com. v. Fremont Investment & Loan*, 897 N.E.2d 548, 452 Mass. 733 (Mass., 2008)

4. the loan-to-value ratio is one hundred percent, <u>or</u> the loan carries a substantial prepayment penalty, <u>or</u> the loan carries a prepayment penalty that extends beyond the introductory period.

16. The Belchers' transaction with Union Federal Bank of Indianapolis precisely meets all the criteria established in prongs #1, #2, and #4 above. But as the Massachusetts Supreme Judicial Court opined in *Drakopoulos v. U.S. Bank Nat'l Ass'n*,[5] at [991 N.E.2d 1095]:

> Nothing in our decision in *Fremont,* however, was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case. Rather, "[t]he holding of *Fremont* was that [G.L. c.] **93A prohibits 'the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay.'**" *Frappier v. Countrywide Home Loans, Inc.,* 645 F.3d 51, 56 (1st Cir.2011), quoting *Fremont, supra* at 748–749, 897 N.E.2d 548. (emphasis supplied)

17. Judge Gants' seminal opinion in granting the Attorney General's motion for a Preliminary Injunction in the case against Fremont established the foundational concepts and criteria for analyzing whether a subprime Adjustable Rate Mortgage loan is "Presumptively Unfair" under existing laws regardless of who the lender may be. In the instant case, Union Federal Bank of Indianapolis's loan to Robert Belcher is Presumptively Unfair for the following reasons:

1. **the loan is an adjustable rate mortgage ("ARM") with an introductory period of three years or less;**

    a. Robert Belcher executed an Adjustable Rate Note on December 22, 2005 that contained an introductory "teaser" rate good for only one (1) month after which it was to adjust every month based on an Index and Margin formula as stated in paragraph 4 of the Note. (*See* Exhibit B. – Adjustable Rate Note, 12/22/2005)

2. **the loan has an introductory or "teaser" rate for the initial period that is at least 3% lower than the fully indexed rate;**

---

[5] <u>See</u> *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 991 N.E.2d 1086 (Mass., 2013).

    a. The introductory "teaser" rate disclosed in paragraph 2 of the Note is 1.500%; however, the fully indexed interest rate on the consummation date was 6.500%.[6] Accordingly, the "teaser" rate exceeds the Fremont tolerance by 5.000%.

3. **the borrower has a debt-to-income ratio that would exceed fifty percent if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate;**

    a. Discovery is necessary to analyze this factor although Mr. Belcher alleges his income for 2005 was approximately $51,000.00. If so, the debt-to-income ratio for housing expense alone would equal 76% of his income calculated as follows:

| Fully Indexed Principal & Interest | $2,604.12 |
|---|---|
| Real Estate Taxes | $519.08 |
| Homeowners Insurance | $125.00 |
| **TOTAL PITI:** | **$3,248.20** |

$$\$51,000.00 \div 12 = \$4,250.00$$
$$\$3,248.20 \div \$4,250.00 = 76\% = \text{Debt-to-Income Ratio}$$
$$76\% > 50\%$$

4. **the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty (defined by the judge as greater than the "conventional prepayment penalty" defined in G.L. c. 183C, § 2) or a prepayment penalty that extended beyond the introductory rate period.**

    a. Union Federal Bank of Indianapolis imposed a 36-month prepayment penalty as a condition of the transaction. Since the "introductory rate" applied only to the first month of the first year, the prepayment penalty extended well beyond the introductory rate period and this prong of the Fremont test is satisfied. (*See* Exhibit B. – Prepayment Charge Addendum to Note)

18.     In *Com. v. Fremont Investment & Loan*,[7] the Massachusetts Supreme Judicial Court found that certain mortgage loans will be covered under the Massachusetts Predatory Home Loan Practices Act (M.G.L. c. 183C) if it can be shown that the lender made the mortgage

---

[6] The

[7] *See Com. v. Fremont Investment & Loan*, 897 N.E.2d 548, 452 Mass. 733 (Mass., 2008).

loan without regard to the "borrower's current and expected income, current and expected obligations, employment status, and other financial resources other that the borrower's equity in the dwelling which secures repayment of the loan." Quoting from *Fremont*:

> b. *General Laws c. 183C.* General Laws c. 183C, the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004(act), prohibits a lender from making a "high-cost home mortgage loan"[24] unless the lender reasonably believes at the time the loan is made that the borrower "will be able to make the scheduled payments to repay the home loan based upon a consideration of the [borrower's] current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower's equity in the dwelling which secures repayment of the loan." G.L. c. 183C, § 4. This section further states, however, that a borrower is presumed to be able to repay the loan if the borrower's debt-to-income ratio, calculated
>
> [897 N.E.2d 560]
>
> based on the fully indexed rate associated with an ARM loan, does not exceed fifty per cent of the borrower's verified monthly gross income. *Id.* at § 4, second par. The act prohibits a high-cost home mortgage loan from containing any provision for prepayment fees or penalties. G.L. c. 183C, § 5. Chapter 183C expressly provides that a violation of the statute constitutes a violation of G.L. c. 93A. G.L. c. 183C, § 18 (*a*).
>
> Fremont's mortgage loans were not "high cost home mortgage loans" governed by G.L. c. 183C, as the judge recognized. Fremont contends, however, that the judge improperly interpreted c. 183C to reach Fremont's loans, and thereby violated basic rules of statutory construction that prohibit inferring a legislative intent to reach conduct that the statute's unambiguous language clearly does not cover.
>
> Fremont's argument lacks merit. Even though the loans have different terms from Fremont's, the conduct the act prohibits,
>
> [452 Mass. 749]
>
> and deems a violation of G.L. c. 93A, is similar to the central element of unfairness the judge found in Fremont's lending practices: the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay. See G.L. c. 183C, § 4. *That the Legislature chose in the act to focus specifically on home loan mortgages with different terms and features from Fremont's is not dispositive; the question is whether the act may be read to establish a concept of unfairness that may apply in similar contexts. As stated by the single justice of the Appeals Court, the judge appropriately could and did "look to Chapter 183C as an established, statutory expression of*

*public policy that it is unfair for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.*"[25] (emphasis supplied)

19. If this Court finds that the subject transaction constitutes a violation of the Massachusetts Predatory Home Loan Practices Act, then a number of important consumer protection provisions become available to the Belchers pursuant to M.G.L. c. 183C:

> **Section 3**: **Certification from counselor with third-party nonprofit organization**: A high cost home mortgage loan originated by a lender in violation of this section shall not be enforceable.

> **Section 4: Obligor's ability to make payments; presumption**: A lender shall not make a high-cost home mortgage loan unless the lender reasonably believes at the time the loan is consummated that 1 or more of the obligors, will be able to make the scheduled payments to repay the home loan based upon a consideration of the obligor's current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower's equity in the dwelling which secures repayment of the loan.

...(1) the borrower's scheduled monthly payments on the loan, including principal, interest, taxes, insurance, and assessments, combined with the scheduled payments for all other debt, do not exceed 50 per cent of the borrowers documented and verified monthly gross income.

> Section 15: Affirmative claims and defenses available; applicability:

   (a)   Any person who purchases or is otherwise assigned a high-cost home mortgage loan shall be subject to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original lender or broker of the loan...

   (b)   (2) A borrower may, at any time during the term of a high-cost home mortgage loan, employ any defense, claim, counterclaim, including a claim for a violation of this chapter, after an action to collect on the home loan or foreclose on the collateral securing the home loan has been initiated or the debt arising from the home loan has been accelerated or the home loan has become 60 days in default, or in any action to enjoin foreclosure or preserve or obtain possession of the home that secures the loan.

> Section 18: Relief; remedies:

   (a)   A violation of this chapter shall constitute a violation of chapter 93A.

(b) An aggrieved borrower or borrowers may bring a civil action for injunctive relief or damages in a court of competent jurisdiction for any violation of this chapter.

(c) In addition the court shall, as the court may consider appropriate: (1) issue an order or injunction rescinding a home mortgage loan contract which violates this chapter, or barring the lender from collecting under any home mortgage loan which violates this chapter; (2) issue an order or injunction barring any judicial or non judicial foreclosure or other lender action under the mortgage or deed of trust securing any home mortgage loan which violates this chapter; (3) issue an order or injunction reforming the terms of the home mortgage loan to conform to this chapter; (4) issue an order or injunction enjoining a lender from engaging in any prohibited conduct; or (5) impose such other relief, including injunctive relief, as the court may consider just and equitable.

(d) In addition, any lender found to be in violation of this chapter shall be subject to sections 2A and 2D of chapter 167.

(e) Originating or brokering a home loan that violates a provision of this section shall constitute a violation of this chapter.

20. The documentary evidence indicates that Union Federal Bank of Indianapolis structured a mortgage transaction that is or should be covered by the Massachusetts Predatory Home Loan Practices Act (M.G.L. c. 183C).

❧ *Continued Below* ❧

## *Certification*

The factual and expert opinions stated above are based on my research, review of and reliance upon the documents and information supplied to date. I reserve the right to amend and supplement my opinion based on documents and data gathered through the discovery process and supplied to me in the future.

Therefore, based on my education, specialized knowledge and professional expertise as a *Mortgage Fraud and Forensic Analyst* and a *Certified Fraud Examiner*, I find, with a reasonable degree of certainty, that the opinions expressed herein are true and accurate.

Subscribed and signed voluntarily, under penalty of perjury, pursuant to the provisions of 18 U.S.C. § 1621, and Rule 15 of the Massachusetts Rules of the Superior Court, including Standing Orders effective March 1, 2018 on this ***23th day of July 2020*** in Brewster, Massachusetts.

Respectfully submitted,

*Marie Mc Donnell*

Marie McDonnell, President & CEO
*Mortgage Fraud and Forensic Analyst*
*Certified Fraud Examiner*
*Master Analyst in Financial Forensics*

McDonnell Property Analytics
15 Cape Lane | Brewster, MA 02631
(v) 774-323-0892 | (f) 774-323-0894
Marie@mcdonnellanalytics.com

July 23, 2020